IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

BRYAN ROBERT DOYLE,

      Plaintiff,

v.                                      Civil Action No. 18-cv-736

CHRISTOPHER STACHEL

      Defendant.

Expert Report of John J. Ryan

1. My name is John Ryan. I have been actively involved in police practices and law enforcement since 1981. I was an active police officer for twenty years. In the final year of my active career and since my retirement in June of 2002 from police services, I have been involved in police and law enforcement practices as a private consultant regarding law enforcement issues.

2. My education includes a Bachelor of Science Degree in the Administration of Justice from Roger Williams University in Bristol, Rhode Island; a Master of Science Degree in the Administration of Justice from Salve Regina University in Newport, Rhode Island and; a Juris Doctor Degree from Suffolk University Law School.

3. From 1993 until 2002, I served as an adjunct faculty member in the graduate Administration of Justice Program at Salve Regina University in Newport, Rhode Island. In that capacity I was responsible for graduate courses on Constitutional Issues in Law Enforcement; Police Misconduct/Civil Liability; Managing Police

1

Organizations; Contemporary Issues in the Justice Field; Juvenile Justice; Mental Health Law; and Business Crime.

4. Since 2000, I have written several manuals for use by police officers. Two of these manuals are extensively used by Rhode Island Law Enforcement agencies. These manuals are:  Rhode Island Law Enforcement Officers' Guide to Criminal Procedure, 2000, and Rhode Island Law Enforcement Officers' Bill of Rights, A Guide to Investigations and Hearings, 2000. The other manuals are nationally distributed by the Public Agency Training Council as materials used in conjunction with training programs for public employees. These manuals are: Legal and Liability Issues in the Public Schools, 2001; Policy Development for Public Safety Agencies, 2002, Civil Liability and Risk Management for Law Enforcement Agencies, 2003, Use of Force, 2004, Administrative Investigations In Law Enforcement Agencies, 2004, Legal and Liability Issues for Hostage Negotiators, 2005, Public Safety Media Relations (Manual and Guide) 2005, Arrest Search and Seizure, 2005, and Law and Best Practices for Successful Police Operations, 12 High Risk Critical Tasks That Impact Law Enforcement Operations and Create Exposure to Liability Litigation 2007, 2010, 2013 and 2016 editions,  Legal and Liability Risk Management Manual Guide-The Law and Best Practices of Successful Jail/corrections Operations 2009 and 2016 editions.

5. I also author an annual publication for law enforcement officers titled, Case Law for Critical Tasks in Law Enforcement.  This field guide provides officers with a legal update on critical tasks such as search, seizure, use of force, pursuit,

investigations and interrogations.  This guide has been adopted by agencies around the United States for use by law enforcement personnel.

6. I am currently the co-director of the Legal and Liability Risk Management Institute along with James Alsup, and Lou Reiter.  In that capacity I author and edit the institute's legal update service for law enforcement.  This update service and an archive of all articles that I have written can be found at www.patc.com and www.llrmi.com.  Additionally, I provide multiple on-line video roll-call trainings annually for both the road and jail operations. This on-line roll-call series is a subscription service offered by the Legal & Liability Risk Management Institute.

7. As part of the Legal and Liability Risk Management Institute I also conduct policy, training and operations reviews for law enforcement agencies and jails throughout the United States.  These reviews focus on the manner in which agencies treat the critical tasks in law enforcement and jail operations.  As part of these reviews I assist agencies in identifying areas in policy, training and operations that may be improved upon to bring the agency within the legal mandates and generally accepted practices in law enforcement and jail operations.

8. Since 1993, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, attorneys and judges.  I have provided training in the following areas:

   a.  Policy development for public safety agencies.

   b.  Legal Issues in police use of force.

   c.  Legal Issues in internal affairs investigations.

3

d.  Police misconduct/civil liability.

e.  Legal/Liability Issues in Narcotics Operations.

f.  Arrest, Search and Seizure, & Interrogation.

g.  Racial profiling.

h.  Legal issues in public schools.

i.  Media relations for public safety agencies.

j.  Constitutional update for law enforcement officers.

k.  Basic training for detectives.

l.  Law enforcement officers' bill of rights/due process in administrative investigations.

m.  Legal/policy and decision-making factors in law enforcement pursuits including use of force/intervention tactics.

n.  Legal and policy Issues for hostage negotiators.

o.  Legal and liability issues for SWAT operations

p.  Legal and liability issues for jails

q.  High Risk Critical Tasks/Best Practices in Law Enforcement Operations.

9.  I am a former police Captain of the Providence Police Department in Providence, Rhode Island where I served for twenty years before retiring in 2002.  During my tenure as a police officer I served in the following capacities: patrol officer in both the Patrol Division and the Tactical Unit; a detective in the Detective Bureau; a sergeant in the Patrol Division; a lieutenant in the Patrol Division; Director of Training; Director of the Department's Office of Public Affairs and; Director of

the Department's Administrative Staff.  During most of my career I also took an active role in researching and authoring department policy.

10. Since my retirement in June of 2002, I have taught numerous courses on police policy and procedure, arrest, search and seizure, use of force, police pursuits, dealing with the mentally ill, emotionally disturbed, and suicidal, domestic violence, law enforcement's response to autism, law and best practices in the internal affairs process, civil liability for law enforcement agencies, and specialized courses for narcotics officers, SWAT commanders, and internal affairs officers.   Participants in these courses have come from thousands of law enforcement agencies around the United States.  Officers in attendance have come from departments with under ten sworn officers and departments with sworn officers numbering in the thousands.  These programs are conducted numerous times annually throughout the United States and also include on-line courses on these topics for law enforcement.

11. The course on policy and procedure focuses on critical tasks in law enforcement and includes, inter alia, policy issues relating to use of force; police pursuits; domestic violence; sexual harassment and external sexual misconduct; off-duty conduct; hiring & retention issues; internal affairs; supervisory practices; search and seizure; property and evidence; care, custody and transport of prisoners as well as training issues relating to critical tasks in law enforcement.

12. The program on High Risk Critical Tasks/Best Practices in Law Enforcement includes instruction on Use of Force including inter alia: dealing with individuals of diminished capacity i.e. emotionally disturbed, mentally impaired; and

5

suicidal, excited delirium, as well as persons with disabilities and use of electronic control devices; Search-Seizure and Arrest; Pursuit and Emergency Vehicle Operation; Care, Custody, Control, and Restraint of Prisoners; Domestic Violence; Off-Duty Conduct; Sexual Harassment, Discrimination, and Misconduct; Selection and Hiring; Internal Affairs; Special Operations; and Property and Evidence.

13. As a co-director of the Legal & Liability Risk Management Institute I regularly research and draft policies for law enforcement agencies and jails relating to high-risk critical tasks including use of force, arrest-search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control & restraint of prisoners, sexual harassment-discrimination & sexual misconduct, domestic violence, arrest procedures, care, custody, and control of persons with disabilities, and dealing with the mentally ill. In addition, I write, record, produce, and distribute on-line training videos for law enforcement nationwide.

14. In 2002, I was a featured speaker at the national conference for the International Association of Law Enforcement Planners, which was held in Long Beach, California.

15. In 2002, I was a featured speaker at the National Internal Affairs Investigators Association conference, which was held in Tampa, Florida.

16. In 2004, I was a featured speaker at the Rhode Island Bar Association's Annual Meeting, speaking on Constitutional Issues related to Law Enforcement practices.

17. In 2005, I was a featured speaker at the National Sheriffs' Association Annual Conference, held in Louisville, Kentucky, where I presented training for legal advisors on Internal Affairs and Employee Discipline.

18. In 2005, I was a featured speaker at the annual national conference for Public Risk Managers (PRIMA) in Milwaukee where I conducted training for risk managers and attorneys representing police departments.  One of the trainings involved use of force while the second covered the high liability areas in law enforcement operations to include arrest, warrants, and other issues involving search and seizure, as well as police pursuits.

19. I have been a featured speaker annually, to include the 2011 session, of Georgetown Law Center's annual §1983 Civil Rights Litigation program.  I have regularly presented materials related to law enforcement policy, training and supervisory practices as well as use of force. In 2009 I presented materials for two sessions one of which was on the use of TASER and one which was a panel discussion on strip searches.  I have been published annually in materials from Georgetown Law Center related to this program.  The 2011 session was focused on reviewing current law enforcement practices and civil liability related to TASER.

20. In November of 2005, I was a featured speaker at the annual National Conference of the National Leagues of Cities & Towns in Seattle, Washington speaking on Contemporary Liability Risks for Law Enforcement Agencies.

21. In October of 2006, I was a featured speaker at the annual conference of National Internal Affairs Investigators' Association in Gatlinburg, Tennessee.

22. I have also provided lectures for attorneys on civil rights litigations relating to law enforcement operations, including a November of 2006 presentation for the Georgia Bar Association's ICLE program.

23. In 2007, I was a featured speaker at the annual conference for the International Municipal Lawyers Association.

24. In 2007, 2008, 2009, 2012 and 2013, I was a featured speaker at the Practising Law Institute's Annual Section 1983 Civil Rights Litigation program.  My 2007 presentation in this program resulted in a law review article in the Touro Law Review (Volume 24, Number 3, pages 569-600) "Recent Developments in the Use of Excessive Force by Law Enforcement" Karen Blum/Jack Ryan.  It is noted that my materials have been included in their annual publication related to this program.

25. In 2008, I was a featured speaker at the annual conference for the Association of American Law Schools, Civil Rights section, where I presented material on law enforcement policy, training, and generally accepted practices in pursuits and use of force.

26. In 2009, I was a featured speaker for the national conference for public risk managers.

27. In 2009, I conducted executive level training on law enforcement pursuit operations for the Utah Highway Patrol.

28. In 2009, I was certified with TASER by the Muncie Indiana Police Department by a TASER certified instructor.

8

29. In 2009, I was a featured speaker at the Annual Kentucky Tactical Officers' Association Conference where I lectured on high risk tasks in tactical operations including high risk entries.

30. In 2009, I was the featured speaker at the Alabama Attorney General's annual "Law Enforcement Summit" where I lectured on high risk critical tasks in law enforcement to include use of force, pursuit, arrest, search and care, custody and control of prisoners.

31. In 2010, I was a featured speaker at the annual national conference for PRIMA where I presented a law enforcement risk management program titled: "Promoting Professionalism while Reducing Liability; The Impact of Policy, Training, and Supervision and Auditing Strategies."

32. In 2010, I was a featured speaker at the National Internal Affairs Investigators Association annual conference held in Indianapolis, Indiana where I lectured on Bias Free Law Enforcement/Profiling.

33. In 2010, I was a featured speaker at the annual conference of the National Council of County Association Executives, where I spoke on law enforcement liability and strategies to reduce liability by increasing professionalism.

34. In 2012, I developed a training program for law enforcement and attorneys dealing with use of force; electronic control devices; and sudden custody death. This program, which I am presenting throughout the United States is accompanied by a text manual which I wrote and is also being distributed nationwide. As part of this program I have trained thousands of officers with respect to the expected and

appropriate response in dealing with persons who have been injured or otherwise shown physical distress during the subdual process.

35. In 2012, I was a featured speaker at the National Internal Affairs Investigators Association Annual Conference where I spoke on Use of Force and Sudden In-Custody Death.

36. In 2012, I was a featured speaker at the Texas Commission of Law Enforcement Officers Standards and Education where I presented to law enforcement trainers from throughout the State of Texas on training liability and the need for training in the high risk critical tasks in law enforcement.

37. In 2013, I was a featured speaker and panel member in a program titled "Policing in Trying Times" at Suffolk University Law School in Boston Massachusetts.

38. In 2013, I was a featured speaker at "Police K-9" magazine's national Handler Instructor Training Seminar, an annual conference for K-9 handlers and trainers. This presentation focused on the law and best practices for use of law enforcement K-9s as a tool of apprehension.

39. In 2015, I was a featured speaker at the spring conference as well as the annual conference of the International Municipal Lawyer's Association.    The presentation topic was officer involved shootings and qualified immunity post Plumhoff.

40. In 2015, I was a featured speaker for the annual conference of IADLEST, International Association of Directors of Law Enforcement Standards and Training.   My topics included "Training Liability" and "Emerging Liability Trends."

41. In 2015, I was a featured speaker at the Georgia Jail Association's Annual Conference in Savannah, Georgia where I presented topics relating to high-risk critical tasks in the jail operation.

42. In 2015, I was a featured speaker at the Arkansas Association of Chiefs of Police annual meeting where I presented materials on the Law and Best Practices for Policing in Trying Times.

43. In 2015, I was a featured speaker at the South Carolina Municipal Association's Annual Meeting for Elected Officials where I presented materials on Law Enforcement in Trying Times as well as covering issues related to law enforcement body cameras.

44. In 2015, I was a featured speaker for the Texas Commission on Law Enforcement where I provided training for 750 law enforcement trainers from throughout the State of Texas covering topics related to law enforcement liability and proper training.

45. In 2015, I was a featured speaker at the National Internal Affairs Investigators' Annual Conference where I presented training on emerging trends in law enforcement liability and the interplay of the Internal Affairs process with agency liability.

46. In 2016, I was a featured speaker at the annual conference of the Defense Research Institute in Austin, Texas.

47. Since 2002, I have been involved in the auditing of law enforcement operations throughout the United States conducting several audits annually based on either a need or as a proactive measure of agency performance in the high liability areas

of the road and jail operation. I have been involved in assisting dozens of departments nationally through these audits in developing policy, training, and enhancing operations for law enforcement services.

48. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

49. I have reviewed the following materials to date regarding this case:

    1. Complaint
    2. Squad Video 9-5-14: SPD_276.090514.033302
    3. Doyle Additional Incidents:
    4. Dole Bryan Contacts
        a. 15-322463 Incident Redacted Juveniles
        b. 15-145165 Report
        c. 15-32950 Incident
        d. 14-290270 Report
        e. 08-2238 Report
        f. 04-1218 Report _Redacted
    5. Body Video 9-5-14: Pict0007 -2014.0905_04.09.06
    6. PICT0006 -2014.09.05_04.07.18
    7. PICT0005_2014.09.05_03.58.46
    8. Kwic-Trip Video
    9. Doyle handwritten statement
    10. Face Sheet of Officer's report 15-313201
    11. Officer's report
    12. PICT007_2015.09.15_04.48.34
    13. Plaintiff's Response to Defendant's 1st Discovery Requests 1-3-19 (signed)
    14. Stoughton PD Use of Force Policy
    15. Use of Force 09-14-15
    16. Deposition of Chief Gregory Leck
    17. Deposition of Christopher Stachel
    18. Deposition of Bryan Doyle

50. This expert report is based upon the materials provided to this date. The opinions presented in this report are based upon my specialized experience, training and knowledge of police practices as well as my continued research and work with law enforcement nationally. This work includes conducting training for law enforcement around the United States as well as auditing the policies and

operations of law enforcement agencies around the United States. My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration and supervision. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind I recognize that there may be additional documentation as the case progresses.   In the event that additional material is produced I shall be prepared to supplement this report.

51. At the outset it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties.

52. The law enforcement event reviewed in this report involves the interaction between Officer Christopher Stachel of the Stoughton, Wisconsin Police Department and Bryan Doyle, the plaintiff in this case.  The event which resulted in this lawsuit occurred on September 14, 2015.

<u>Deposition of Officer Christopher Stachel</u>

53. Patrol officer Christopher Statchel ("Officer Stachel" or "Stachel") has been a police officer with the Stoughton, Wisconsin Police Department since May of 2009. On September 15, 2015 Statchel was on patrol when he observed a vehicle pull into a Kwik Trip parking lot. Officer Stachel checked the registration of the vehicle, and determined that the vehicle was registered to Brian R. Doyle. (29). When he ran Mr. Doyle's registration, Stachel observed that Mr. Doyle had an active warrant from Eagle, Colorado. (31). Stachel maintains that he thought the

warrant was from Eagle County. (31).  It is noted that there is no Eagle County in Wisconsin.

54. Officer Stachel then followed Mr. Doyle into the Kwik Mart and approached Mr. Doyle at the counter of the store. (50). Stachel informed Mr. Doyle that he had an active warrant and asked Mr. Doyle to produce identification and Mr. Doyle initially declined to produce the identification. (51).   At this time, Officer Stachel informed Mr. Doyle that he was being placed under arrest, and at this point Mr. Doyle stated that he provided Officer Stachel with the identification. (51). Instead of allowing Mr. Doyle to produce his identification, Officer Stachel thought it would be in his best interest to control Mr. Doyle's hands. (52). Officer Stachel further informed Mr. Doyle that he was being detained and that if he did not cooperate, he would be taken to the floor. (53). At this point, Officer Stachel took Mr. Doyle to the floor and placed him in handcuffs. (54).

55. After Mr. Doyle was taken to the floor and placed in handcuffs, Officer Stachel received information from dispatch that the warrant for Mr. Doyle was from Eagle, Colorado, was not valid in Wisconsin, and that extradition of Mr. Doyle was only limited to surrounding states. (55-56).

56. After determining that the warrant was not valid in Wisconsin, Mr. Doyle stated to Stachel that Stachel had been harassing Mr. Doyle for a long time. (59). At this point, Officer Stachel warned Mr. Doyle that he could still be arrested for resisting. (60). Officer Stachel then did in fact arrest Mr. Doyle for resisting. (60). During the course of this subsequent arrest for resisting, Officer Stachel stated that he was going to release Mr. Doyle, but that Mr. Doyle kept running his mouth

regarding Officer's Stachel harassing treatment. (68). Mr. Doyle was ultimately released by Officer Stachel in the parking lot of the Kwik Stop.

57. It is noted that Officer Stachel testified that when he entered the Kwic Trip, he did not recognize Doyle as someone he had dealt with in the past, going as far as to report: "I don't remember anybody in the past." (29-30).

58. After the incident with Mr. Doyle, Stachel was spoken to by Lieutenant Jenks. (77). Lieutenant Jenks told Stachel that the incident with Mr. Doyle could have been handled better. (77). Lieutenant Jenks and Stachel reviewed the body camera footage of the incident and Lieutenant Jenks made recommendations to Stachel about how Stachel could have handled the situation better. (78).

59. Stachel was also spoken to by Detective Hill and Officer Sargent. (81). Hill and Sargent discussed professional communications and the DAAT model with Stachel. (82). Hill and Sargent further advised Satchel on the use of presence and dialogue in the context of this situation. (83).

60. Stachel testified that he did not feel that he did anything wrong with respect to his actions with Doyle and then noted: "I feel I could have waited for my partner to arrive, I could have double-checked things more thoroughly before making contact." (17).

Deposition of Chief Gregory Leck

61. Chief Leck testified that he became aware of the events involving Mr. Doyle and Officer Stachel two to three days after it occurred when he was informed about it by Lieutenant Jenks. (7-8).   Leck said that Jenks was responsible for reviewing use of force incidents and that was what prompted Jenks to make Leck aware of

the incident.  (8).   Leck said that he did review the body-cam video of the event
and that a determination was made that there were no policy violations in the event
initially.  (8-9).  Leck said that at a later point in time Jenks came back to him
with his overall evaluation of the event. (9). Chief Leck testified:   "Ell, his
evaluation was that the incident, although proper and within the confines of the
policy that was in place at the time, he did believe that the—there could have been
more dialogue involved, there could have been more methods used instead of the
ones that were used at the time." (9).

62. Chief Leck testified that he approved Jenks recommendation that included "a
professional communications review, along with a defensive tactics review with
Officer Stachel, again looking at better practices, not that there was anything that
was improper, but we thought there was better methods that could be used." (9-
10).

63. Chief Leck reported that he was aware that Mr. Doyle had filed a handwritten
complaint to the department that was also followed up on by Lieutenant Jenks.
(10).   Leck stated his belief that Jenks found no policy or law violation and
relayed that conclusion to Doyle. (11).

64. Chief Leck acknowledged that the preferred method of executing a warrant is to
determine whether it is valid before making contact but noted that the verification
often happens after contact has been made.  (13-14).

65. Chief Leck testified was asked what the officer could have done better or
differently to which he testified that even with a video: "I'm never in a position
to really second guess the decision that an officer makes based on the

circumstances." (16).  I would note that this position taken by the Chief is contrary to law enforcement principles.  If the Chief were correct no officer could ever be corrected for their improper exercise of force or arrest since even the chief cannot second-guess their actions.   Essentially, the chief is espousing a subjective standard with respect to force and arrest since no one is in a position to second-guess the officer.

### Bryan Doyle Deposition

66. In describing what occurred, Bryan Doyle testified: "I walked into Kwik Trip.  I left home early from work because I wasn't feeling well.  And, honestly, like, I, for one, am always like the type to stay late and whatnot.  And so for me to not make it past, like, I literally only had two hours left or three hours or something. I couldn't even make it.  Like that's how sick I was.  And I asked to leave home early and I still had some vacation, so I just did a vacation fill for the last three hours.  And I stopped at the Kwik Trip on my way, actually, I was going to my girlfriend's house and—I'm sorry.  What was the question….And I got in the Kwik Trip.  And as I'm just, you know, checking stuff out, I remember being a little nervous because Officer Stachel was just kind of looking at me from a distance." (115-116).  Doyle indicated that he saw Stachel inside the store while he was selecting his items but that Stachel then left and Doyle went to pay for his items. (117).  Doyle described that Stachel went outside the store and that when Doyle was at the register, Stachel re-entered the store. (117-118).

67. Doyle said that Stachel asked him for ID and acknowledged that he did not give it to him right away. (118).  Doyle reported that Stachel asked him if that was his

car outside and he said yes. (118).   Doyle testified: "And then he said, the person

who owns that car has a warrant for his arrest.   And knowing that I didn't have a

warrant out, I tried to give him my ID.   And before I knew it, he throws me—he

grabs me by the neck and throws me on the ground."  (118).   Doyle clarified that

he knew there were no active warrants for him in Wisconsin because he had just

paid off all his tickets. (119).   Doyle said that he had paid off the tickets after "He

arrested me for having warrants—and gave me choice to either go to Sauk County

Jail or pay the warrants.   I paid the warrants in Sauk County.   And he told me

Jefferson County had a warrant out for me, but did not need to—didn't have like

an arrest warrant.   And so I just decided to drive down to Jefferson, just pay the

ticket off and it was done for…And like I had explained earlier, I tried to call

about the Colorado warrant.   There's nothing I can do about it, aside from

physically go down there, leave the state.   And I don't even know if I would go

back to court, reopen the case.   I don't know." (119-120).   Doyle reported: "The

next thing I remember, he had me on the ground and he had his knee digging into

my back.   And then all of a sudden out of nowhere, he just decides to let me go

and then that was it.   And then he threatened to arrest me again for resisting. (122).

68. Doyle testified to additional incidents with Officer Stachel including the incident

where Stachel let him pay the tickets from Sauk County described above and an

incident in January of 2015 where Stachel stopped Doyle relative to the same

Colorado warrant that was at issue in the events that are subject to this lawsuit

occurring nine months later in September of 2015. (133-134).   Additionally,

Doyle testified that there was an interaction between he and Stachel sometime

around October of 2013 where Stachel brought up the warrant from Colorado.
(15).   Doyle testified that Stachel knew him by name and was previously aware
that the Colorado warrant had a geographic limitation of the states surrounding
Colorado.  (134-135).

<u>Brian Doyle 10/8/15 Written Statement</u>

69.  In a written statement document the incident, Brian Doyle stated the following:
"On September 14, 2015, I left work early at 11:30 as I was not feeling good. On
my way home I stopped at Kwik Trip to pick up some cough drops and fever
reducer. While in Kwik Trip I saw Officer Stachel who I did not know by name,
but by face. [Sic] As he has pulled me over on two separate occasions within the
past year. As I was checking out officer Stachel re-entered Kwik Trip and asked
if I drive a black car, I responded "yes why". Officer Stachel responded "Can I
see your license?"  Because I wasn't aware of anything I did wrong, at first I said
"no." Officer Stachel then stated there was a warrant out and pushed me up against
the counter, and told me I was under arrest, and started to put my hands behind
my back to cuff me. At which point I told him I would give him my license.
Officer Stachel stated quit resisting arrest, to which I replied "I'm not, I'm
reaching for my wallet. Officer Stachel continued to handcuff me despite me
trying to identify myself per his instructions. He then grabbed me by the neck and
forcefully threw me to the ground at which point, my forehead struck the cement
floor. As I was explaining to officer Stachel that the warrant was for only
Colorado and surrounding states he also got confirmation from dispatch. I asked
[sic] why he was harassing me he said he wasn't and then said he could take me

in for resisting arrest. Officer Stachel then assisted me up off the ground and escorted me out of Kwik Trip, still in handcuffs. And as he was releasing me from custody outside the front of Kwik Trip he continued to harass me about the warrant. Immediately my lower back was hurting. The following day I went to urgent care for my sore throat and did mention the previous night's incident, and my new onset of back pain. It was recommended I follow up with my own provider. The following day I followed up with my own provider who then ordered physical therapy for which I am currently receiving. I feel officer Stachel used excessive force. Officer Stachel clearly did not review the warrant as it specifically states Colorado and surrounding states only. Even after I offered my ID, officer Stachel continued to cuff me and threaten to place me under arrest. I feel officer Stachel publicly humiliated me by approaching me inside of Kwik Trip instead of waiting to question me upon leaving. He also violated my rights and left me helpless as with him being an officer of the law. At first I was afraid to turn to the Stoughton Police Department in regards to this incident."

Video/Audio SPD dated 9/5/14

70.  The dash cam video of 9/5/14 depicts Doyle being stopped and when the officer approaches, he immediately asks the driver if his name is Bryan Doyle and when Doyle responds affirmatively, the officer informs Doyle that he has an active warrant. It is noted that there were two officers at this scene.  The officer tells Doyle is the result of having received a previous ticket.  Doyle complies with the officer's order to get out of the vehicle and to place his keys on top of the vehicle. Doyle immediately complies with directives to put his hands behind his back for

handcuffing.   The officer informed Doyle that the first warrant was within the county and was therefore enforceable but then indicated that a second warrant from Albany had a "geo" [Geographic] restriction on it, which limited its enforcement to the county where it was issued.   [Green County].   Doyle was arrested without any resistance or incident.

Officer Stachel Report of Incident 15-313201

71. "On the above date, at approximately 11:51 p.m., I was at Kwik Trip West in the city of Stoughton where I observed a vehicle pull up to the store area.   Upon checking the registration, I found the vehicle to be registered to Bryan R. Doyle. Using my in-squad data terminal I performed a record check on Doyle's operating status and found an active warrant for Doyle at this time.   In checking the warrant, I observed that it was from Eagle CO, which I initially believed to be Eagle County, and I proceeded to Kwik Trip to make contact with this subject.   As I entere3d the gas station I observed the subject that had exited the vehicle at the checkout.   I asked this subject, who was later identified as Doyle, if he had any identification on him.   Doyle said he did.   I then asked to see the identification and Doyle stated that he would not show it to me.   Prior to this I had also confirmed that this was also the individual who had been driving the vehicle that was parked outside, I informed Doyle that the reason I was making contact was due to an active warrant.   Doyle stated he did not have to show me any identification, and I informed Doyle that I would be detaining him while I attempted to identify him and figure out the warrant issue.   As I began to grab Doyle's hands to place them behind his back in an attempt to handcuff Doyle, he

became rigid and tensed up, pulling his hands away and not allowing me to handcuff him. Doyle stated that he did not have to be identified and that he would not be detained. As I continued to try to gain control of Doyle's arms, I did press Doyle against the counter at Kwik Trip, bending him forward slightly at the waist and directing him to relax and to not resist and tense up. Doyle continued to be resistive and tense, pulling away and attempting to twist away from my grasp. I informed Doyle that if he continued to do this I would take him to the ground. Doyle again tensed up and pulled away, at which point I then put my left arm up and over Doyle's left shoulder and then shot my arm underneath Doyle's right arm, grabbing his chest area, where I then spun my hips, and pulled Doyle down on to the ground with me on top of him. I turned Doyle's head to the side, pressed his head to the tiles, and instructed him to get his hand behind his back. Doyle placed his left hand immediately behind his back. Doyle's right hand was beneath his body. I pulled Doyle's right arm out, placing it on the small of his back and handcuffing him. I continued to instruct Doyle not to resist. It was at this time I was notified by dispatch that the warrant was issued through Eagle Colorado and was only extraditable for surrounding states. Based on this information I informed Doyle I would be letting him up. Doyle became confrontational and I then informed he that he could still be arrested for resisting and that he should quiet down and allow me to get the handcuffs off of him. Doyle was stood up and escorted outside, as he was beginning to cause a scene inside the gas station; even more so than what had already occurred. I took Doyle outside, patted him down, and then removed the handcuffs. I informed Doyle that he should get the warrant

22

taken care of, as he was stating that the police were 'harassing' him concerning the warrant. I informed Doyle that if he continues to have a warrant, police would continue to have contact with him and that he should get if settled. Doyle stated that he did not want to go back to Colorado to deal with this issue as he would be arrested if he went there. Doyle was released and I cleared the scene." (15-313201).

Stachel's Use of Force Report

72. "On September 14, 2015, I was at KTW when a vehicle pulled up with a male occupant driving. I checked the plate and found the registered owner to be BRYAN A. DOYLE. I performed a record check on DOYLE and found he had an open warrant out for his arrest. I attempted to make contact with DOYLE at the cash register and DOYLE refused to identify himself. I informed DOYLE why I was making contact and DOYLE stated he didn't have to identify himself. I took hold of DOYLE's hands attempting to place handcuffs on his informing DOYLE he was being detained while I attempted to identify if he was the subject there was the warrant for. DOYLE began tensing up and pushing back against me attempting to twist out of my grasp before I could put handcuffs on him. Doyle was instructed that he needed to stop resisting or I would take him to the ground and Doyle persisted in tensing and trying to pull free. I then decentralized by reaching up over Doyle's left shoulder and under his right arm pulling him backwards and down to the ground. Doyle was placed on his stomach and his head was held to the floor as I gave commands to put his hands behind his back. DOYLE followed instruction and was handcuffed. I was informed at this time

that the warrant was from Colorado and extradition was for surrounding states only. DOYLE informed me he knew he had a warrant but did not want to take care of it or he would go to jail. DOYLE was released and instructed to take care of the warrant and advised that resisting when contacted by police could result in charges even if the warrant was not extraditable." (SPD Use of Force Report Case # 2015-313201).

Body-Worn Video labeled 9/15/2015

73. It is noted that the video begins with what appears to the be Officer Stachel standing on the side of the building waiting for something. The officer then proceeds from the side of the building and moves to the entrance, entering the store. Officer Stachel addresses Doyle who is standing on the customer side of the cash register, asking Doyle: "Sir, is this you black Nissan?" Doyle responds that the vehicle is his. Officer Stachel then began asking Doyle for identification. Doyle asked Stachel why he needed to see ID and Stachel responded that the registrant of the vehicle had an active warrant. Doyle responded that Stachel was lying at which point Stachel again asked for ID to which Doyle responded No. Stachel then told Doyle that he was going to place Doyle under arrest. Doyle responded that Stachel could not do that at which point Stachel said that if Doyle was not going to identify himself and Stachel saw that Doyle had a warrant, Doyle was under arrest. At that point Doyle indicated that he would provide the ID. At the same time Stachel began telling Doyle to stop resisting.

74. It is noted that at the point that Stachel begins telling Doyle to stop resisting, Stachel had begun going hands on with Doyle grabbing Doyle's arm.



2015-09-15  04:49
GMT +0

75.

76. As Doyle responded that he was not resisting but was trying to get his wallet, Stachel indicated that Doyle was being "detained." It is noted that freezer frames of the video as shown above, show that Stachel had Doyle against the store counter, facing away from him and had at least one of Doyle's hands controlled and behind his back. There is no evidence on the video depicting any resistance by Doyle. Instead, it is clear that Stachel is holding Doyle's arm behind his back.



77.

78. As the video continues, it is clear that Stachel has control of Doyle's hand.



79.



80.

81.  It is clear from the video that Stachel is able to get a two-handed hold on Doyle.



82.

83. As Doyle continued to question what Stachel was doing, Stachel then said that

Doyle was being detained because Stachel was trying to do his investigation.   As

Doyle began to ask another question, he was taken to the ground by Stachel. Stachel then began giving further directives for Doyle to place his hands behind his back.  It is noted that there is no evidence in the video to indicate that Stachel released control of Doyle's hand(s) prior to the takedown.

84. After the takedown Stachel is giving directives for Doyle to stop resisting and place his hands behind his back.  It is clear from the video that during this time, Stachel had two-handed control of Doyle.



85.

86. It is clear from the video that Stachel is in control of both of Doyle's hands.



87.

88. It is noted that as Stachel cuffed Doyle's left arm and continued to indicate that

   Doyle was resisting and tensing up, Stachel released Doyle's right arm and used

   both hands to accomplish the cuffing of the left hand.



89.

90. After his hand is released there is no indication in the video that Doyle moved his right hand from behind his back.  In fact, based on the way that Stachel was able to move and cuff Doyle's right hand demonstrates that Doyle was not moving this hand after it was released.

91. It should be noted that within 94 seconds of making contact with Doyle, Stachel is informed that the warrant for Doyle is only good in surrounding states (of Colorado) to which Stache responds "10-4 he'll be released shortly."  It is clear, that if Stachel had waited for warrant verification in accordance with generally accepted policies and practices for slightly over a minute and half, he would have known that there was no basis to stop or arrest Mr. Doyle.

92. Instead of immediately releasing Doyle as is required when a determination of no justification for stop or arrest is learned, Officer Stachel began to lecture Mr. Doyle regarding the Colorado warrant.  Doyle began to explain to Stachel how he had attempted to resolve this warrant.   It is noted that at approximately 2 minutes and 13 seconds into the overall video, including Stachel standing on the side of the building, Stachel learned that the warrant was for surrounding states only thus, he had no authority to detain or arrest Doyle with respect to a warrant. Notwithstanding Stachel's report to the dispatcher that Doyle would be released (2 minutes 20 seconds) Doyle remained handcuffed on the floor during Stachel's lecture.  It is noted that during this time Doyle tells Stachel that Stachel has been harassing Doyle for a long time, to which Stachel raised his voice stating that he was not harassing Doyle.

93. Once Doyle complained of being harassed, Stachel after loudly reporting that he was not harassing Doyle responded to the complaint of being harassed stating he could still take Doyle in for resisting arrest, "do you want me to do that."   All officers are trained that an arrest in retaliation for a person's complaint regarding police conduct is contrary to all generally accepted policies, practices, training, and the legal mandates trained to officers for application in field operations.

94. When Doyle responded no, Officer Stachel then told Doyle to chill out while he took the handcuffs off him.   Doyle again complained saying that Stachel had thrown him on the ground to which Stachel responded to this complaint by then saying:  okay, well then, you're under arrest for resisting then.   Meanwhile, Doyle remained handcuffed on the ground.    Stachel continued: "If that's the way you want to play it, that's fine."   Stachel stated that he was trying to cut Doyle loose but Doyle "kept running" his mouth about Stachel being so harassing to Doyle. Stachel continued to lecture Doyle telling Doyle to go back to Colorado and deal with the warrant continuing on and telling Doyle to man up and deal with it.  After removing the handcuffs at approximately 4:28 seconds into the recording, Stachel told Doyle that he was free to go.

Kwic Trip Video

95. It is noted that the use of force by Officer Stachel was also captured on the video surveillance system in the Kwic Trip. A review of this video establishes that Officer Stachel was in the Kwic Trip making a purchase and exited for a short period of time before returning to confront Doyle.

96. The in-store video captures the use of force by Stachel.  Initially, the video shows Stachel leveraging Doyle against the counter and taking control of both of Doyle's arms.



97.

98. The video then depicts Officer Stachel releasing Doyle's left hand and Stachel's left arm going up over Doyle's head before wrapping around Doyle's neck.  It is noted that Doyle's left arm remained down by Doyle's side.



99.

100.   Officer Stachel's left arm can be clearly seen wrapped around Doyle's neck before Stachel shifts his weight decentralizing Doyle using Doyle's neck for leverage to pull Doyle down to the floor.  It is noted that Doyle's left arm, from the shoulder to the elbow remained in a downward position.



101.

102.   Doyle's arm only moves to an upward position after Officer Stachel further

lengthened the distance between his feet and took Doyle to the ground with a high-

speed uncontrolled dentralization.



103.

Reports

104.    A police report authored by Officer Poole of the Stoughton Police Department
and dated September 4, 2014 indicated that Poole stopped Doyle after he left the
parking lot of the Kwic Trip.   Poole indicated that he had run Doyle's plate
approximately one week prior and determined that Doyle had three warrants but
only one was actionable since the other two had geographic restrictions. (14-
290270).  The report noted that Doyle's aunt responded and paid the bond on the
warrant.  (14-290270).  I would note that in watching the video of this stop that
there was at least one additional officer on the scene when Doyle was arrested
without incident.  (Squad Video 9-5-2014).

105.   An additional report from 1/30/2015 was authored by Officer Stachel and listed Bryan Doyle as the suspect. (2015-00032950).   The report clearly indicates "Out with Bryan Doyle 07/16/88."   The report then indicates "Valid 99 out of CO but extradition to surrounding states only." (2015-00032950).   It is noted that it is clear from this report that Stachel had contact with Doyle and noted: "Made contact, aware of 99 and does not plan on taking care of it anytime soon.  8932 made contact with him because 99 came up on driving record as he exited his car. No action taken." (2015-00032950).   Thus, nine months before the event that led to this lawsuit, Officer Stachel ran Bryan Doyle and was notified that the warrant out of Colorado for Doyle was not valid in Wisconsin, as Wisconsin was outside the geographical restrictions placed on the warrant.  More importantly it is clear that Stachel had a detailed discussion with Doyle about the warrant.  It is noted that in his sworn deposition Stachel acknowledged a prior contact with Doyle and testified: "At the time of that contact I was not aware of any warrant from Colorado.  I did note in my report that there were other warrants that were non-actionable at that time, but it was not from Colorado." (Stachel 11).

106.   In describing his first contact with Doyle, Stachel testified: "During the interaction I was on patrol.  I was in North Industrial Park.  We had complaints from business owners concerning suspicious activity, potential thefts and thefts from the area.  I observed a subject walking during the hours of darkness carrying, I believe it was a notepad and pen.  I made contact with this subject, who was Mr. Doyle, and during a routine records check I found that there were warrants for his arrest." (Stachel 13),   Stachel said: "I shone a spotlight at him, exited my squad,

36

spoke to him face to face, asked him what he was doing in the North Industrial Park at this time, where he was going, where he was coming from…He said he was leaving an AA meeting and he was walking home." (Stachel 13-14).   Stachel reported that he arrested Doyle on the warrants at that time. (Stachel 14).

107.   Stachel reported that he had another contact with Doyle that he did not remember well where he informed Doyle of the Colorado warrant that was not actionable. (Stachel 20-21).

108.   It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting and training that the detention and investigation undertaken by Officer Stachel was inconsistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations.

109.   I would note at the outset that Officer Stachel has testified that he did not recognize Mr. Doyle as a person he had previously stopped and arrested on other occasions, going as far as to testify: "I don't remember anybody in the past." (29-30).   While this report specifically avoids making credibility determinations, I note that officers throughout the United States are expected to be familiar with the criminal element and to use this historical knowledge of individuals in their operations.   Law enforcement has historically required officers to be familiar with all persons in their area that are known to commit criminal conduct, a requirement that goes well beyond being familiar with those an officer has not only stopped,

but actually arrested in the past.[1]  It is clear based on the documents that Officer Stachel had not only stopped but had arrested Mr. Doyle in the past.  Additionally, in accord with the police report related to Stachel's stop of Doyle in January 2015 Stachel had previously made a determination as to the validity of the Colorado warrant's enforceability in Wisconsin. (2015-00032950).

110.   If a trier of fact finds that Officer Stachel recognized Bryan Doyle and was exercising a continued pattern of harassment by acting on a warrant he knew was not enforceable then the conduct is even more egregious and contrary to all law enforcement practices.  I would note that Stachel's statements on the video indicating that Doyle should go back to Colorado to straighten out the warrant and that it is not the fault of the police that Doyle is being stopped on the warrant is consistent a pattern of harassment by Stachel rather than a proper law enforcement objective.

111.   Officers throughout the United States are trained that there are two distinct justifications for depriving a citizen of liberty relating to the investigation of criminal activity.  The first of these justifications is commonly referred to as a "Terry Stop" or investigative detention.  Officers are trained that these stops do not require probable cause to believe the person has committed a crime, but rather are justified on a lesser degree of proof, specifically "reasonable suspicion."[2]  It is noted that during a reasonable suspicion based detention officers are trained

---

[1] "Regulations of the Providence Police Department, Circa 1960 §107.9 "Duties of Beat Patrolman"  (d) "A beat patrolman shall obtain from proper sources, and shall familiarize himself with the identification of characthers on his beat who are known to the police."

[2] See e.g. The Law Enforcement Officer's Pocket Manual 2008 Edition, Miles, Richardson, and Scudellari, Bureau of National Affairs Arlington Va. 2008. § 2:8; See also Quick Reference Legal Guide for Law Enforcement, Critical Legal Tasks in Law Enforcement 2008-2009, Jack Ryan, PATC Books, 2009  P. 10.

that the purpose is to confirm their suspicion through the development of probable cause or dispel their suspicion.[3]

112.   Officer Stachel was asked a number of questions with respect to whether he had arrested or detained Mr. Doyle.  Stachel testified: "It was a detention.  I know in the video I did say arrest." (Stachel 46).   In describing the distinction between arrest and detention, Stachel testified: "A detention would be a short term to confirm facts and to verify part of the investigation.  An arrest would be that you have probable cause to arrest." (46). Stachel said that his interaction with Doyle was a detention pending the verification of the warrant. (Stachel 46).   Stachel was asked whether a person has to disclose their identification if a police officer asks for it to which he responded: "In the case of—or in the course of an investigation, based on the totality of the circumstances, failure to identify somebody is nt obstruction.  However, had they lied about their information, then that would be obstruction." (Stachel 26-27).   Stachel acknowledged that based on his understanding of the law Mr. Doyle had the right to say, "No, I don't want to give you my ID." (Stachel 27).   Notwithstanding Stachel's testimony at deposition, it is clear from the video that when Doyle initially refused to produce his identification, Officer Stachel responded to the effect of, Okay, then I'm going to place you under arrest.

113.   While many states require a person to identify themselves during a valid investigative detention, all officers are taught that they cannot require a person to

---

[3] See, <u>The Law Officer's Pocket Manual 2008 Edition</u>, Miles, Richardson, and Scudellari, The Bureau of National Affairs, Inc. Arlington, Va. 2008. §2.14.

produce identification, but instead can ask the person to identify themselves.[4]  A refusal to provide a verbal response to a request for their name during a valid investigative stop may result in an arrest for obstruction in a state that has a stop and identify statute, however officers throughout the United States are trained that they may not demand the production of identification.  It is noted that in the video of this event, Officer Stachel never asked Doyle his name, but requested more than once that Doyle produce identification.  It was Doyle's refusal to produce the ID that resulted in Stachel telling Doyle he was being arrested.

114.   In describing his knowledge base in testimony, Stachel testified: "When I ran the license plate of the vehicle parked out front, it came back to a subject identified as Robert Doyle.  Utilizing that information at that time that I believed to be a valid warrant, I later found to be an error, I attempted to make contact with him to verify if he was the driver.  And as he was the only one in the store, the vehicles there, the description matched, I was trying to confirm identity.  I believe it was objectively reasonable that an officer would believe that he would be the registered owner of the vehicle." (Stachel 27-28).  If the trier of fact were to accept Stachel's statements that he did not remember Doyle and did not remember that the same warrant he had reviewed in the past was not valid and the trier of fact were to further accept this testimony that Stachel was still trying to determine identity, then the stop was, at best an investigative stop.  Any reasonable and well-

---

[4] Wis. Stat. § 968.24 "After having identified himself or herself as a law enforcement officer, a law enforcement officer may stop a person in a public place for a reasonable period of time when the officer reasonably suspects that such person is committing, is about to commit or has committed a crime, and may demand the name and address of the person and an explanation of the person's conduct. Such detention and temporary questioning shall be conducted in the vicinity where the person was stopped."

trained officer would conclude that a demand for the production of identification and a threat to arrest as well as an actual physical confrontation with the subject based on their refusal to produce an ID would be inconsistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations.

115.    Officers throughout the United States are trained that the second justification for deprivation of liberty of a citizen is when an officer has probable cause to believe that the subject has committed a criminal offense.  Additionally, training and texts make clear that: "All arrests-whether with or without a warrant –must be based on probable cause. You must have sufficient knowledge of facts and circumstances that would lead a reasonable police officer to conclude that the suspect probably committed the crime."[5]

116.    It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting and training that the force used by Officer Stachel was inconsistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations.

117.    Officers throughout the United States are trained in two formulas with respect to use of force decision-making and justification.  The first of these formulas is a three-part test that parallels the mandates announced by the United States

---

[5] See, <u>The Law Officer's Pocket Manual 2008 Edition</u>, Miles, Richardson, and Scudellari, The Bureau of National Affairs, Inc. Arlington, Virginia 2008.  at §4:2

Supreme Court in *Graham v. Connor.*[6]  The training directs officers to consider the seriousness of offense; whether or not the subject poses an immediate physical threat to the officer or anyone else; and finally whether the subject is actively resisting or attempting to evade arrest by flight.

118.   In accord with the materials there is no indication that Mr. Doyle was committing a serious crime at the time of his interaction with Officer Stachel.  If a trier of fact determines that Stachel knew Doyle from their previous encounters that included a custodial arrest and was aware that the warrant was unenforceable as Stachel had previously determined, then Stachel would have no basis for believing that any offense was occurring.   Officer Stachel did not articulate and the video does not show any physical threat posed by Mr. Doyle.  At most there was verbal non-compliance to produce an ID that in accord with the forgoing opinions and the testimony of Stachel, Mr. Doyle was not required to produce.  In accord with the video there was no active resistance depicted, however it is noted that Stachel was indicating that Doyle was tensing up after Stachel began using force on Doyle through grabbing Doyle and attempting to handcuff him for failing to produce ID.  Based on the Kwic Trip video, I cannot see any active resistance offered by Mr. Doyle when he was pinned against a fixed-object, the counter with both his hands behind his back and being held by Stachel. There is no evidence from the documents, from Stachel, or from the video indicating that Mr. Doyle attempted to evade arrest by flight.

---

[6] This formula is derived from *Graham v. Connor,* 490 U.S. 386 (1989) and can be found in law enforcement training lesson plans as well as Use of Force policies throughout the United States.  See e.g. International Association of Chiefs of Police, Use of Force Model Policy 2005, IACP Model Policy Center, Virginia 2005.

119.   As noted, even assuming that Stachel did not know the warrant was unenforceable which is clearly disputed, if Stachel had waited approximately ninety seconds for the verification by the dispatcher, he would have known that the warrant was not valid for enforcement in Wisconsin as he had learned on the prior occasion.

120.   The second formula was commonly referred to as the "Use of Force Continuum."  While agencies utilize different force continuum models, all of the models recognize that officers have various subject control tactics available to them and that these tactics range from a low-level intrusions, such as officer presence and verbal commands, to the highest level, which is deadly force. It should be recognized that even in those agencies that still use a force continuum, the continuum is not a ladder that must be climbed step by step.  Instead it is a presentation of various force options, each of which must be objectively reasonable under the circumstances with which the officer is faced.  It is noted that due to confusion over application of such continuums, law enforcement is moving away from this concept and simply train "force options."  It is recognized that many law enforcement agencies are moving away from the so-called "continuum" and moving toward a "Graham" decision-making model.

121.   Use of force training and policy, which is common to law enforcement throughout the United States, includes provisions indicating to officers that head strikes are prohibited unless deadly force would be justified.  This type of training and policy provision exemplifies the recognition by law enforcement that blunt strikes or force applied to the head is both capable and likely to cause serious

bodily harm or death.  It is recognized that in a takedown or decentralization where the officer does not protect the head, such blunt force trauma may occur. It is noted that here, based on the testimony of Stachel, that he had forced Doyle against a fixed-object, the counter, and had taken a hold of Doyle.

122.    Training on the decentralization tactic indicates that such tactics should be used in circumstances where an officer believes that the subject cannot be controlled while standing and is violently resisting.[7]   There is no evidence in the video or in the reports and testimony of Officer Stachel that shows any violent resistance on the part of Mr. Doyle.  In fact, other than Stachel's report of Doyle tensing up in response to being grabbed by Stachel, there is no indication of any resistance. While Stachel can be heard on the video telling Doyle to stop resisting, Doyle can be heard indicting that he was not resisting but instead was trying to get his wallet out in response to Stachel's commands for an ID.

123.    Common training of this tactic includes some critical considerations that must be made by an officer before using this tactic: "Any decentralization technique used however, must allow you to follow these critical guidelines to minimize the chance of injury to the subject: 1) Protect the subject's head and neck as much as possible; 2) Control the speed of the subject's descent." [8] "Decentralizations that do not permit these actions may be considered excessive force."[9]  Based on the contemporaneous statements of Doyle and the description of the method of decentralization by Stachel, Doyle was not in a position to protect his own

---

[7] See e.g. "Defensive and Arrest Tactics, A Training Guide for Law Enforcement Officers" Wisconsin Department of Justice, April 2002.
[8] Id.
[9] Id.

face/head when taken to the ground. Additionally, the speed and the uncontrolled nature of the takedown is clearly evident in the Kwic Trip video.

124.   Any reasonable and well-trained officer would have recognized that a decentralization under the foregoing facts was inconsistent with generally accepted policies, practices, training and legal mandates trained to officers for application in field operations.

125.   It is my opinion, based upon my specialized background, education, training, and experience as well as my continued research, authoring, auditing, consulting and training that the continued detention of Doyle after making a determination that the warrant was not enforceable was inconsistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations.

126.   It is clear from the video that Mr. Doyle complained of his treatment in this event and of ongoing harassment after Stachel was told that the warrant was only valid in surrounding states.  Even assuming that Stachel did not recognize Doyle who he had multiple contacts with and whom he had already reviewed the validity of this particular warrant, the continued detention of Doyle was inconsistent with generally accepted policies, practices, training, and legal mandates trained to officers for application in field operations.

127.   All officers are trained that when their justification for detention or arrest dissipates they must immediately cease any restraint on the person's liberty.  As noted in this report. Officer Stachel did not immediately release Mr. Doyle. Additionally, in response to Doyle's complaints about Stahel's ongoing

harassment and his use of force in this incident, Stachel told Doyle that he was going to take further police action because Stachel was "running" his "mouth." Law enforcement throughout the United States takes complaints about officer conduct seriously.   All law enforcement accepts and investigates all complaints. Based on the video, Officer Stachel not only did not respond appropriately to Doyle's complaint, but instead Stachel retaliated with further police action against Stachel which is contrary to all generally accepted policies, practices, training and legal mandates trained to officers for application in field operations.

128.   At this stage of my review I do not know if I may be asked to review additional documents.   Should I be asked to review any additional documents I will be prepared to render additional opinions or supplement the opinions stated within this report.

129.   At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony.   Should I decide to use any such tool; I will assure that they are made available for review, if requested, prior to their use.

130.   My fees for these professional services are outlined in the attached retainer agreement.

This report is signed under penalty of perjury on this 29th day of March 2019, in Greenville, R.I.

_s/John J. Ryan_
John J. Ryan